**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **BENJAMIN MOHAMMED AL HABASHI,** | ) | |
|   **(Binyam Mohamed)** | ) | |
| | ) | |
|     **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-00765** |
| | ) | **Hon. Emmet G. Sullivan** |
| **GEORGE WALKER BUSH, et al.** | ) | |
| | ) | |
|     **Respondent.** | ) | |
| | ) | |

# PETITIONER'S REPLY TO RESPONDENT'S OPPOSITION TO MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S ORDER AND PROPOSED DISCOVERY SCHEDULE

Cori Crider
Ahmed Ghappour
Zachary P. Katznelson
Clive A. Stafford Smith
Reprieve
PO Box 52742
London EC4P 4WS
United Kingdom
011 44 207 353 4640

*Counsel for Petitioner Mohamed*

Petitioner respectfully submits this Reply to *Respondent's Opposition to Petitioner's Motion to Compel Compliance with this Court's Order and Proposed Discovery Schedule* (hereinafter *Opposition*). As suggested at the last hearing, Petitioner appends his proposed discovery to his Reply.

The central issue of this case is – as the UK court has said – whether any democratic country can hold a person *incommunicado* for two years and then refuse to tell anyone (including the prisoner's home government) where and under what conditions he was held.

This is the seventy-ninth month of Mr. Mohamed's imprisonment.  For virtually all of the first seventy-eight months, Respondent made the Petitioner out to be a would-be dirty bomber and member of al-Qaeda.  This Court has rightly determined that the government's effort to hurry away from the allegations that were, for six years, the core of its case *on the day of the disclosure deadline* does not make Mr. Mohamed's torture in Morocco and the Dark Prison suddenly irrelevant.[1]

## I.      DISCLOSURE MUST COME BEFORE ANY MEANINGFUL ASSESSMENT CAN BE MADE OF RESPONDENT'S 'EVIDENCE'

Petitioner will not rehash the arguments made in his initial pleading concerning Repondent's contempt of this Court's order.  Suffice it to say that *presumably*[2] everyone agrees that Petitioner has the right to contest whether any statement attributed to him was extracted through torture or some other form of coercion.

---

[1] Counsel for Respondent stated at oral argument that the government stands behind everything it has said about Petitioner (though it will not now seek to prove most of it).  Slashing the dirty bomb plot, we are told, was done to achieve simplicity and expediency, rather than a last-minute whitewash to evade the Court's order.  Frankly, this is not credible.

[2] Respondent has kept silent when it comes to what standard should be applied in consideration the admissibility or sufficiency of the evidence used to detain Petitioner, but one assumes that Respondent no longer advocates the use of evidence predicated on torture, as well as cruel, inhuman or degrading treatment.

In an effort to excuse his failure to comply with the disclosure order, Respondent's opposition places the proverbial cart in front of the horse in various ways.

A. **THIS COURT HAS PROPERLY RECOGNIZED THE NEED FOR IMMEDIATE DISCOVERY**

The route already chosen by the Court for the expeditious timing of discovery is the appropriate one for a number of reasons.

i. **Respondent's demand for a "preliminary traverse" of the Amended Factual Return (AFR) is a pretext to prevent the truth from coming out, but Petitioner will call Respondent's bluff**

Respondent would have Petitioner traverse the case against him without meaningful disclosure from the government. The route already chosen by the Court is the appropriate one but Petitioner, tired of Respondent's constant efforts to avoid compliance with this Court's order, will file a preliminary traverse anyway.

Respondent desperately wants to avoid providing disclosures to the Court and to Petitioner for a simple reason: Respondent's agents committed criminal offenses against Petitioner. Now, faced at last with a real Article III court, Respondent is deathly afraid that he will have to admit it – and to identify who in the Bush Administration authorized the commission of these crimes.

Respondent's latest wheeze in trying to delay the inevitable is to dismiss the allegations that have been the main focus of this case to date, and to pretend that Petitioner does not deny the others. Now Respondent says that Petitioner must make a preliminary reply to what remains in the Amended Factual Return (AFR) or he cannot have any disclosure.

There is no need for a preview "traverse" to the AFR, as the AFR is merely a response to Petitioner's original habeas petition, which set out Mr. Mohamed's position more than three years ago:

15.  Detained Petitioner is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind.

16.  Petitioner is not, and never has been, a member of Al Qaida or any other terrorist group.  Prior to his detention, he did not commit any violent act against any American person or espouse any violent act against any American person or property. Nor was he involved in the ensuing armed conflict.  He had no involvement, direct or indirect, in either the terrorist attacks on the United States on September 11, 2001, or any act of international terrorism attributed by the United States to Al Qaida or any terrorist group.  He is not properly subject to the detention Order issued by the President.  As he did not participate in the armed conflict at any point in time, he is not properly subject to the Executives's authority as Commander in Chief and under the laws and usages of war.

17.  Petitioner has had no terrorist training.  He at no time voluntarily joined any terrorist force.

18.  Petitioner was not initially taken into custody by American forces.  He was taken into custody against his will and handed over to the Americans.  There is no credible evidence that he engaged in combat against American forces.

19.  Petitioner promptly identified himself by his correct name and nationality to the United States.  He requested that the United States provide him with access to his family and to legal counsel. He was kept blindfolded against his will for lengthy periods while being taken involuntarily to Guantánamo.

20.  Petitioner has been forced to provide involuntary statements to Respondents' agents both prior to and after his arrival at Guantánamo.

21.  Petitioner has been terribly abused and tortured by Respondents' agents.

22.  Petitioner has been held under conditions that violate his international and constitutional rights to dignity and freedom from cruel, unusual and degrading treatment or punishment. He has been housed throughout his detention in accommodation that fails to satisfy both domestic and internationally accepted standards of accommodation for any person subject to detention.[3]

However, Petitioner is quite willing to illustrate for this Court that Respondent is merely

grasping for another pretext to avoid the truth coming out.  Therefore, Petitioner files with this

---

[3] *Petition for a Writ of Habeas Corpus, at para. 15 et seq.*

pleading the "preliminary traverse"[4] demanded by Respondent, repeating what he has always said.[5]  With that red herring out of the way, Petitioner moves on to more important matters.

> ii.   **In an effort to excuse his violation of this Court's order, Respondent airily dismisses the notion that "exculpatory" means what the US Supreme Court says it means, but fails to offer any alternative**

Respondent repeatedly suggests that Petitioner, in relying on Supreme Court precedent, is using the wrong definition of the term "exculpatory".[6]  This is, Respondent tells us, the root of all our problems. He suggests that some different meaning of "exculpatory" applies in this habeas case than elsewhere in the law.  Yet at no point does Respondent grace this Court with what his novel definition of the term might be.

We do hear about what the word does *not* mean.  Respondent does not like the idea that the term "exculpatory" should include "anything that would help [Petitioner] disprove Respondent's case." (*Respondent's Opposition at 20*).  But if evidence that helps Petitioner prove his innocence is not deemed exculpatory, then what is?

---

[4] Respondent only asks for a "a preliminary factual traverse".  *Respondent's Opposition, at 3.*

[5] Petitioner does not do this because he thinks it is required or because the Court has ordered it; he does it to remove yet another of Respondent's dilatory obstacles from the route to justice.

[6] *Respondent's Opposition at 1* ("Petitioner's apparent discovery plan is built upon a mischaracterization of what constitutes 'exculpatory' evidence…."); *id. at 26* ("Petitioner's proposed discovery plan is based on an erroneous and inappropriate definition of 'exculpatory'").

Respondent has a habit – one might say a tradition – of redefining words to avoid the inexorable consequences of the law.[7]  We need not debate the applicability of the *Brady* doctrine to this case[8] to dismiss Respondent's argument.  Respondent quarrels with the notion that the term "exculpatory" should be read by reference to "the *Brady* obligation to produce exculpatory evidence, *i.e.*, evidence material to the guilt or innocence of a criminal defendant, arising in the domestic criminal context under the Fifth Amendment." *Respondent's Opposition at 21*.[9]  Such a reading is wrong, we are told, because Petitioner's is not a criminal case.  *Id.*  But this misses the point.  What does Respondent suggest that this Court meant by "exculpatory" if not evidence relevant to Petitioner's innocence?

*Brady* and its progeny help define what the term "exculpatory" means as a matter of law. In ordering Respondent to produce exculpatory evidence, this Court used the term in its ordinary meaning.  The Court said as much on September 22.  It does not matter how Respondent would like to redefine the word in his own imaginary world,[10] because the order with which Respondent

---

[7] Undersigned counsel apologizes for relying on his own publication as a source of authority, but it does draw together some of these examples.  See Clive Stafford Smith, *Eight O'Clock Ferry to the Windward Side: Seeking Justice in Guantánamo Bay* (Nation Books, 2008).  For example, in order to deny the presence of juveniles in Guantánamo Bay, Respondent inexplicably redefined the legal term as the Supreme Court has consistently used it (the prisoner must be under 18 at the time of his alleged offense) to mean that a prisoner must be under 16 now. *Id.* at 146.  To avoid allegations that the conditions in Guantánamo had sparked a spate of suicide attempts, Respondent redefined this as "manipulative self-injurious behavior." *Id.* at 138-140. Respondent's agents said they had a "spiritual advisor" for the Muslim prisoners when the cleric was a fundamentalist Christian.  Id. at 143-144.  And so on.

[8] Petitioner does note that the American people are ill-served when Respondent suggests it is somehow appropriate to hold Petitioner without trial, yet deny him access to evidence that could prove his detention to be a mistake.

[9] Presumably, here, Respondent only suggests that evidence material to innocence should be considered exculpatory, not evidence of guilt.

[10] If Respondent continues to balk at this Court's order, Petitioner requests that – in addition to the sanctions already suggested – this Court order Respondent to set out in writing what, in his redefinition of the word, he thinks the term "exculpatory" means.

is obliged to comply is this Court's order, using this Court's language.  Thus, the term must be understood as this Court intends.

### iii.   Petitioner denies here, as he always has when allowed to make a voluntary statement, that he has done anything that justifies his detention as an 'enemy combatant'

The Court's scheme – requiring that disclosures be made before the factual return is traversed – makes good sense.  For example, Petitioner knows that he was rendered; he knows he was tortured.[11]  At the moment, however, Respondent will not even tell Petitioner where he was held for two years, or provide any access to the evidence that would prove his abuse.

Respondent, displeased with the Court's chosen route, insists that there is no factual dispute between the parties.  Indeed, Respondent argues that Petitioner went to a "terrorist training camp" and does not deny it.[12]

This is nonsense.

Respondent's first supposed trump card is the recitation of the Personal Representative at Petitioner's CSRT:

> For example, on November 14, 2004, months after he was transferred to Guantanamo Bay, Petitioner admitted to his personal representative that he had trained at al-Qaida- and Taliban-sponsored camps but that he was not involved in other plots.  (Factual Return, Ex. 12 - CSRT Personal Representative Statement (Nov. 18, 2004).)

---

[11] This simple distinction continues to elude Respondent.  Petitioner noted with some amusement fn. 8 of Respondent's opposition, which states: "Petitioner is in possession of evidence produced in support of Respondent's factual return, exculpatory evidence produced as part of the factual return and otherwise in this case, and evidence he has collected outside of discovery, *including through access to Petitioner*." (emphasis supplied.)  Surely Respondent cannot state with a straight face before the Court that he should somehow be excused from disclosure because Mr. Mohamed does, indeed, have access to *himself*?  Once again, this confuses Mr. Mohamed's knowledge of his abuse with his effort to prove it.

[12] *Respondent's Opposition at 1* ("he trained in al-Qaida and Taliban-sponsored training camps"); *id. at 2* ("Petitioner has consistently admitted his attendance at al-Qaida and Taliban-sponsored training camps"); *id. at 3.*

*Respondent's Opposition at 25-26.*  Actually, this was not "months" after he arrived in

Guantánamo Bay – it was one month and 23 days.  And Respondent's recitation of the

"admission" that Mr. Mohamed supposedly made is dishonest.[13]

Respondent's other trump card, twice repeated, is a newspaper report.[14]  If Respondent

wishes to reply on newspaper reports as evidence, he should at least refrain from quoting his

materials in such a misleading manner.[15]  To be sure, Petitioner went to Afghanistan, but he did

not go to "terrorist" training camps, and he does not concede that he had anything more than a

vague ambition to help the Muslim victims of the Chechen genocide.[16] Many respected people in

the West have shared this goal, including President Bill Clinton.[17]  Petitioner has never conceded

---

[13] See *Statement of Personal Representative* (Petitioner "stated he went for training to fight in Chechnya which was not illegal.  The detainee stated that the other items were rubbish or were made under duress.  He further stated that he traveled before 11 Sep 2001, which means he had different plans other than going to fight America."). This evidence *specifically contradicts* a separate supposedly "uncontradicted" allegation identified by Respondent:  "Petitioner's travels from the United Kingdom to Afghanistan and his time at training camps, was done for the purpose of ultimately waging jihad against the United States." *Respondent's Opposition at 4.*

[14] *Respondent's Opposition at 2 & 6*, citing to Peter Finn, *Key Allegations against Terror Suspect Withdrawn*, WASH. POST, Oct. 15, 2008, at A18.

[15] The real quote is as follows: "His attorneys don't deny that their client received training in Afghanistan, but they said he wanted to fight in the war-torn Russian republic of Chechnya."  See http://www.washingtonpost.com/wp-dyn/content/article/2008/10/14/AR2008101403146_2.html.  In other words, there is no suggestion that he trained with al-Qaeda or the Taliban, or that he wanted to have anything to do with the Afghan conflict, or any attack on the US.

[16] It should be noted that this does not involve some extremist splinter group within Chechnya: a large majority of Chechens are Muslim.  See http://en.wikipedia.org/wiki/Chechnya ("Most Chechens are Sunni Muslim, the country having converted to that religion between the 16th and the 19th centuries. Most of the population follows either the Shafi'i, Hanafi, or Maliki schools of jurisprudence").

[17] By 1999, President Clinton was strongly critical of the Russian assault on Chechnya.  See, e.g., BBC News, *America's New Hard Line on Chechnya* (Nov. 3, 1999), at http://news.bbc.co.uk/1/hi/world/europe/503804.stm ("Mr Clinton's meeting with Russian prime minister Vladimir Putin in Oslo was dominated by the new war in Chechnya.  The American president expressed strong concern about civilian casualties and pressed Mr Putin to seek a political solution.").  Since then, the plight of Chechens has gotten more dire still.  See, e.g., Human Rights Watch, *Chechnya: Research Shows Widespread and Systematic Use of Torture*

– except falsely, under torture and abuse – that he had any ambition to attack the US or its allies. Indeed, by the time the Afghan war began, Petitioner had abandoned even his desire to go to Chechnya, and he sought merely to go home to Britain – not to travel to the US.

Petitioner set out the disagreement between the parties in simple terms in his original petition and he will do it again:  it is his position that *all* of the 'evidence' submitted against him with the AFR (indeed, every statement taken from him by the government through this ordeal) was the direct result and bitter fruit of torture, as well as cruel, inhuman and degrading treatment. In other words, not one allegation against him is supported by admissible evidence, whatever the standard may ultimately be.  Likewise, Petitioner has always denied that he trained in "terrorist training camps" with a view to committing any act against the US or its coalition allies.

In truth, because Respondent has obfuscated at every turn, essentially all facts are in dispute at the moment.  Respondent needs to think long and hard about whether he wishes, in good faith, to dispute certain aspects of the case.  If Respondent replies briefly and forthrightly to the simple requests for admission proposed by Petitioner, much of the argumentation will fall away, and this Court's task will be much simpler.  Such is one purpose of discovery.[18]

Respondent makes what is essentially a motion for summary judgment against Petitioner –

---

(2006), at http://hrw.org/english/docs/2006/11/13/russia14557.htm; Michael Church, *As Russia continues its murderous policy, the world has forsaken Chechnya* (Independent, Mar. 27, 2007) (Book review of Tony Wood, *Chechnya: The Case For Independence*; discussing "[t]he installation of Ramzan Kadyrov as president of Chechnya … [a]s a gangster heading a puppet regime"; "Chechnya's million people would have been far more, had it not been for Russia's repeated attempts at genocide"; etc.).

[18] Respondent's allegations illustrate the need for discovery before a meaningful debate can take place.  For example, Respondent says that Petitioner went to an Algerian training camp. *Respondent's Opposition at 4* ("Petitioner attended an Algerian Jihad training camp").  But the (unclassified) materials disclosed to Petitioner in the UK show that this supposed Algerian camp closed before Petitioner ever went to Afghanistan. See *UK Materials, 0017Ex* (before Petitioner arrived in Afghanistan, "the camps belonging to the Algerian, Moroccan, Tunisian and Egyptian groups had all been closed down.").

suggesting that there is no need for discovery because the evidence is supposedly unrebutted, and therefore sufficient to justify Petitioner's limitless detention. *See Respondent's Opposition at 2* ("the Court should have a sufficient factual basis for finding that the Petitioner is properly designated as an enemy combatant.")  This argument borders on frivolous.  Respondent keeps moving the goalposts in an effort to avoid discovery, but rather than adding proof of Petitioner's supposed guilt, Respondent has now withdrawn the most significant allegations – the *only* ones involving any putative attack on the US.  Now, the Court is told, the other patently less serious items should be viewed as the most important.[19]  Of course, these were far from the central issue for the first seventy-eight months of Mr. Mohamed's imprisonment.

> iv.   **While this Court must decide the standard under which Petitioner may be held, it is clear that Respondent's own definition of this term is being used as a pretext to limit the definition of "exculpatory"**

In arguing that this Court should find Petitioner to be an 'enemy combatant' without any meaningful factual development, Respondent prefers not to define for this Court what the term should mean.  Given that Mr. Mohamed stands to stay in Guantánamo Bay indefinitely on this determination, perhaps for the rest of his life, this is a serious omission.

If this Court is ultimately going to assess what the legal definition should be, it is best done in the context of the facts, rather than some hypothetical.  If, as Petitioner anticipates, the Court finds that there is no admissible evidence of any kind that Petitioner committed or planned any hostile act against the United States or its allies, then there is no need to resolve the issue, as Petitioner could not be held under any legitimate standard.  If, on the other hand, the Court

---

[19] *Respondent's Opposition at 13* ("Thus far, Petitioner has avoided addressing the most important factual allegation justifying his detention:  that he attended al-Qaida- and Taliban-sponsored training camps in the months before and after the terrorist attacks of September 11, 2001."); *Respondent's Opposition at 8* (referring to these allegations as "the core, material facts in the factual returns").

concludes otherwise, then it will be appropriate to define a proper standard, and assess whether it has been met.

Respondent does not cite a standard, but seems to suggest that if anyone has ever been to a training camp in Afghanistan then he is an 'enemy combatant.' (*Respondent's Opposition at 2*) Indeed, Respondent elsewhere suggests that anyone who is not an "errant tourist, embedded journalist, or local aid worker" would qualify as an 'enemy combatant'. (*Id. at 4*)  Casting aside the fact that undersigned counsel have represented a prisoner who was an embedded journalist along with various aid workers, all of whom were found by Respondent to be 'enemy combatants' in their CSRTs, surely Respondent can do better than this in coming up with a definition.

Ultimately, the proper definition of the term is a debate for another day.  However, it will be important for this Court to resolve what Respondent means by 'enemy combatant', since Respondent's use of an erroneous standard (or no standard at all) contributes to Respondent's refusal to comply with this Court's order.  Since Respondent argues that anyone but a journalist can be held as an 'enemy combatant', he apparently presumes, as a corollary, that virtually nothing is exculpatory (unless there is proof that Petitioner was working for Associated Press).[20]

Thus, Respondent suggests that Petitioner's visit to a training camp[21] in Afghanistan is enough to hold Petitioner for the "duration" of hostilities that may last a lifetime.  But this would not be true under any definition of the term.

For example, Judge Leon recently settled on an extremely broad definition of the term, the one used by the CSRTs which have been invalidated by the Supreme Court:

---

[20] If Respondent continues to balk at complying with this Court's order, Petitioner respectfully suggests that Respondent be required to provide his definition of this term as well.

[21] This is not, Petitioner reemphasizes, the same as a "terrorist" training camp, designed to prepare him to wage hostilities against the US and its allies.

> An 'enemy combatant' is an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners.  This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

*Order of October 27, 2008, at 3-4*, in *Boumediene v. Bush*, No. 04-1166 (RJL).

Even using this constitutionally questionable definition, however, there is simply no way that Respondent's assertion meets the standard.  To go to a training camp at some point prior to September 11th (and prior to the Afghan War), with no intention of fighting the US or its allies, but a vague notion that one might then go to Chechnya to protect the victims of genocide falls far short.  Respondent might as well argue that joining the International Brigades in the Spanish Civil War qualified for eternal detention in Guantánamo Bay.

> **v.**   **While this Court must decide the standard under which statements are admitted in this habeas proceeding, such a decision is best made after full development of the facts and briefing – Respondent cannot use this issue to justify his violation of this Court's order**

Respondent is, predictably enough, vague about what the standard should be to determine the admissibility of evidence.  Again, this issue can only be resolved after discovery, to determine what the facts are before the Court.  Otherwise, the Court would effectively be issuing a declaratory judgment about some hypothesis that might never exist.  Petitioner nonetheless pauses briefly to discuss the admissibility issue here, as Respondent's murky assumptions are part of his proffered basis for withholding exculpatory evidence.

Consider the following statement by Respondent:

> Petitioner's unwarranted demand for alleged additional exculpatory evidence and discovery is also informed by his erroneous view that allegations of past coercion require the exclusion of subsequent admissions.

*Respondent's Opposition at 24*.  In other words, Respondent assumes that the torture and abuse heaped on Petitioner is somehow not relevant – and therefore not "exculpatory".

11

Respondent tells us that "[i]t seems highly unlikely that, even if his allegations about his circumstances before his arrival at Bagram were assumed to be true, exclusion of his later statements would be warranted." *Respondent's Opposition at 25.*  Given that Petitioner was tortured in a medieval manner for more than two years, and was then held incommunicado while he was abused some more, this statement must be deemed mere advocacy.  However, for this proposition, Respondent refers this Court to *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

*Schneckloth* involved a stolen check case, where the police pulled over a car for having a headlight out, and the issue was whether consent to search was voluntary.  Bustamonte was in the rear seat, and when the police asked for permission to search it, the driver said, "Sure, go ahead."  It was, apparently, "all very congenial." *Id.* at 220.

This is rather a stretch from the facts of Petitioner's case.  On Respondent's theory, Petitioner's torture statements are meant to become 'voluntary' and reliable the moment he is taken against his will to Bagram, an illegal, incommunicado detention center in Afghanistan.

Nonetheless, *Schneckloth* does point to some issues that are relevant to this case.  The Court speaks about

> the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice. '[I]n cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.'

*Id.* at 225, quoting *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960).  The Court goes on to conclude:

> The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Id.* at 225-26, quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

Given Respondent's citation, presumably this is the standard that Respondent would have this Court apply.  If so, this makes sense.  It also makes sense for this Court to order discovery concerning the evidence that will help Petitioner demonstrate[22] that his "will was overborne" when he made the statements.[23]

### B.  RESPONDENT'S COLLATERAL ESTOPPEL ARGUMENT IS BIZARRE AND ILLUSTRATES HOW RESPONDENT IS GRASPING AT STRAWS

Petitioner will not detain this Court long with respect to the most risible of all Respondent's arguments: that this Court cannot consider any issues addressed in *Mohamed v. Jeppesen Dataplan Inc.*, 539 F.Supp.2d 1128 (N.D. Cal. 2008).  *Respondent's Opposition at 7.* Jeppesen Dataplan is the Boeing subsidiary that ran the CIA torture flights – including the flight to Mr. Mohamed's grim sojourn in Morocco.  Mr. Mohamed has sued Jeppesen, and the suit was

---

[22] Of course, the burden of proof is, and always has been, on the government to prove the admissibility of statements which are alleged to be involuntary.

[23] Various other statements by Respondent illustrate the need for discovery.  For example, Respondent argues that "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Respondent's Opposition at 24-25.*  This only goes to prove that Respondent must make disclosures concerning the coercive setting of the prior statements if this Court is to be able to make a proper assessment of the ultimate issue.  Indeed, while Respondent protests the notion that disclosures should include the biased "mind-set" of those "who assembled the case against [him]", *Respondent's Opposition at 20*, the attitude of the interrogators in Bagram and Guantánamo are directly relevant to the criteria identified by Respondent as relevant to the admissibility of a later statement.

dismissed on state secrets grounds.  On that basis, Respondent would apparently have this Court

barred from considering at least the following:

    \*  whether Petitioner was part of the CIA terrorist detention and interrogation program;

    \*  whether any particular foreign government participated in that program;

    \*  whether any private entity assisted the government in carrying out the program;

    \*  any locations at which the government detained individuals who were part of the

    program; and

    \*  any methods of interrogation used in the program.

*Respondent's Opposition at 26-27.*

    Again, if Respondent honestly believes this, perhaps it helps us to understand Respondent's

failure to comply with this Court's earlier orders.  Respondent apparently thinks that principles

of collateral estoppel bar this Court from considering the fact that Petitioner was tortured and

abused in Morocco, Afghanistan and Guantánamo, or any of the methods of his abuse, because a

judge in California previously refused to order disclosure in a civil lawsuit against a subsidiary

of Boeing Corporation, based on the Secrets Doctrine.

    Imagine a similar issue that arises quite commonly in habeas cases: a Petitioner on death

row sues his capital prosecutor for damages under §1983 for suppressing favorable evidence.

The lawsuit's theory is that this suppression led to the Petitioner being sentenced to death for a

crime he did not commit.  The prosecutor responds with a defense of sovereign immunity, which

he almost inevitably wins, though nobody denies that he did actually suppress an enormous

amount of evidence in violation of *Brady*.  Under Respondent's theory, the prisoner is doomed to

be executed, despite being innocent, because the federal court on the habeas appeal challenging

the Petitioner's death sentence is collaterally estopped from reaching the merits of an issue that

was dismissed on procedural grounds in the §1983 case.

It is not surprising that Respondent does not cite a case where this has ever been done, because the result would be an abomination.  Yet the facts are even worse here:  Petitioner has never been tried, so he has not even had the benefit of the unfair trial hypothesized above.[24]  Yet Respondent would have him held forever based on torture evidence, without any opportunity to challenge it.  This is not only an absurd result, it would violate the Convention Against Torture.  *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 10 December 1984, 1465 U.N.T.S. 85, Art.15 ("Each State Party shall ensure that any statement which is established to have been made as the result of torture shall not be invoked as evidence in any proceedings, except as evidence against a person accused of torture as evidence that the statement was made.")

## II.     THE NATURE AND TIMING OF THE DISCOVERY PROPOSED BY PETITIONER IS REASONABLE

The bottom line here is that Respondent does not want to make disclosures, because honest discovery will demonstrate what Petitioner has been saying all along:  that he was rendered to torture by the US authorities.  Yet the authority cited by Respondent compels the

---

[24] In this vein, Petitioner also points to a related and equally silly argument proffered by Respondent.  Of course it is true that:

> Petitioner, however, cannot even demonstrate, consistent with *Brady*, that his wide-ranging contemplated discovery will produce "material evidence favorable to the accused . . . [such that] 'there is a reasonable probability that, had the evidence been disclosed . . . , the result of the proceeding would have been different.'" *United States v. Williams-Davis*, 90 F.3d 490, 513-14 (D.C. Cir. 1996) (quoting *Kyles*, 514 U.S. at 433-34).

*Respondent's Opposition at 21-22.*  Petitioner has not been allowed a proceeding that could come out differently.  He has simply been held without trial for nearly seven years.

opposite conclusion.  Discovery is not only reasonable, but necessary for this Court to "dispose of [this] matter as law and justice require," *see* 28 U.S.C §2243.

A. **THIS COURT'S RIGHT (AND DUTY) TO ORDER DISCLOSURES**

Respondent suggests that "[t]here is no general constitutional right to discovery in a criminal case." *Respondent's Opposition at 21 n.13* (citations omitted).  Yet Petitioner does not suggest that this is a criminal case – it patently is not, for if it were, he would have been given a trial long ago.  Rather, it is a habeas case, where discovery rules certainly do apply.  It is well established that Habeas Rule 6, for example, "affords district judges considerable discretion as to discovery." J. Liebman & R. Hertz, *Federal Habeas Corpus Practice and Procedure* ("Liebman"), § 19.4c at 868 (5th ed. 2001).

While discovery is flexible under habeas, surely it must include, at a bare minimum, evidence that will help prove the prisoner's innocence – indeed, it is surprising that a representative of the American government would assert the right to suppress such material.

Respondent suggests that this Court should not – indeed, cannot – order discovery in this case.  In suggesting this, paradoxically Respondent cites to *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). See *Respondent's Opposition at 11*.  Respondent does not point out that discovery was not simply authorized in a habeas case in *Bracy*, but mandated by the Supreme Court.

In many ways *Bracy* is instructive:  the petitioner sought discovery concerning the corruption of a judge on the theory that the judge had not been bribed in his own case, but had shown compensatory bias against him to make up for the get-out-of-jail-free cards that the judge was issuing in other cases. Chief Justice Rehnquist, speaking for a unanimous court, ordered that discovery be allowed, merely quoting the rules:

> A party shall be entitled to invoke the processes of discovery available under
> the Federal Rules of Civil Procedure if, and to the extent that, the judge in the

exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

*Id.* at 904, quoting *Rule 6(a), Rules Governing §2254 Cases*.

The Supreme Court held that a corrupt judge "is 'biased' in the most basic sense of that word…." *Id.* at 904.  Of course, in Petitioner's case, a law enforcement officer who indulges in torture and abuse is 'biased' in an even more reprehensible way, as he has assumed a prisoner's guilt to excuse the commission of shocking acts against his victim.  Bracy did not show that the judge had taken bribes in his case – he merely alleged that there *might have been* compensatory bias – yet the Supreme Court mandated discovery.  *Id.* at 908 ("Although, given the facts of this particular case, it would be an abuse of discretion not to permit any discovery, Rule 6(a) makes it clear that the scope and extent of such discovery is a matter confided to the discretion of the District Court.").[25]

Mr. Mohamed reiterates that *Bracy* and other postconviction habeas cases are, of course, in a posture where the Petitioner has already had one opportunity to develop the facts before a court, in a full trial.  Here, Mr. Mohamed has yet to be given his first chance to do so.  Here, Petitioner has alleged (and presented substantial evidence) that Respondent's agents tortured and abused him over a period of years.  The British Government accepted that he has made out a

---

[25] Liebman elaborates on this point as well:

> The Advisory Committee Notes to Rule 6 indicate that the Supreme Court's treatment of discovery in *Harris v. Nelson* should inform the exercise of that discretion.  In particular, the Advisory Committee Note reaffirms the district court's "duty" under *Harris* to order discovery when a petitioner's specific allegations suggest that full development of the facts may enable her to demonstrate a right to relief.  Habeas Rule 6(a) accordingly authorizes *at least as much discovery as* Harris *permitted*."

*Liebman at 868* (emphasis supplied).

*prima facie* case, unrebutted by the US, that he was rendered for torture; the British courts agreed.  All this has been submitted to this Court, for purposes of justifying discovery.

That the Supreme Court has mandated discovery in habeas makes all the sense in the world.  Respondent argues that Petitioner must "present *his own* factual case", *Respondent's Opposition at 13 n.7* (emphasis in original), but says he cannot have any help from the government, which holds most of the evidence.  Yet torturers inevitably cover up their torture.  Nobody gave Petitioner a boarding card when he was bundled onto his rendition plane.  He was not allowed an in-flight computer showing where he was going.  His torturers and their confederates did not introduce themselves by their real names, or leave their calling cards.  When it comes to torture, the need for the disinfecting light of discovery is far greater than in the ordinary case.  Thus, this Court's orders have been both sensible and compelled by the logic and precedent of *Bracy*.

The hypocrisy of Respondent's pleading is extraordinary.  Respondent has resisted disclosure, and shown contempt for this Court's orders.  Respondent suggests that his second 'search' for exculpatory evidence was "fairly insubstantial" (*Respondent's Opposition at 14*) because he had already produced most of it.  Yet at the time he made this 'search' he had produced virtually nothing.  This 'search' produced only 7 or the 42 documents identified by the British courts as exculpatory, and nothing else – not even the other 35 documents identified as exculpatory by the British,[26] and not even the fact of where Petitioner had been held for all those

---

[26] These were finally turned over, under protest, and Respondent now suggests that his discovery obligations should be resolved by the submission of "the 35 documents involved [in the UK litigation which] are a discrete, limited, and readily identifiable set of materials…." (*Respondent's Opposition at 19*)  Of course they are readily identifiable:  the British have gone to the effort of identifying them among the British intelligence materials, and pointing them out to Respondent.

years.  Given this history of obstructionism, this Court is well-advised to take increasingly firm

steps to ensure compliance with its orders.[27]

B. **THE REASONABLE BURDEN OF THIS DISCOVERY**

Petitioner has previously detailed why discovery is particularly easy for Respondent in

this case: Respondent's OMCP prosecutors insisted that they trawled through all the relevant

files two years ago during the military commission process, they have just done it again, and so

forth. Petitioner will not rehash all this, but some comments are merited on Respondent's

*Opposition*.

Respondent sneers at the notion that the government has some kind of "master file" of his

case. (*Respondent's Opposition at 23 n.15*)  The fact that Respondent would deny this is one

reason why Petitioner asked for the written deposition of Lt. Col. Vandeveld, who has made

various representations to counsel during the time that he headed Petitioner's prosecution in the

military commissions. Respondent (in the person of Lt. Col. Vandeveld) has indeed gone over a

"master file" and already made an exhaustive review of the case.

---

[27] Respondent also complains that Petitioner should not ask for "inconsistent statements of other witnesses to events being described by [Petitioner]." *Respondent's Opposition at 23*. Respondent cites to *United States v. Comosona*, 848 F.2d 1110 (10th Cir. 1988), disparaging the notion that the government should turn over these kinds of statements.  (*Respondent's Opposition at 23*) First, one might note that "Comosona made a motion for the production of all statements 'which might benefit the defense' [and the] trial court granted this motion." *Id.* But it should also be recognized that this is precisely the evidence that will prove Petitioner's case.  Let us consider one example that is suggested by the disclosures made by the British.  Mr. Mohamed had no idea why the US got it so wrong in his case – why was he chosen for "extraordinary rendition" and torture?  The British disclosures, though incomplete (they do not even include evidence of his being held in Morocco), help explain how this came about. American personnel originally focused on Petitioner because they thought he had been involved in the 'dirty bomb' plot with Abu Zubaydah.  The British materials reveal that Mr. Mohamed's version of events was highly inconsistent with Abu Zubaydah's.  Apparently, Mr. Mohamed recognized that the 'dirty bomb' website was a joke, but Abu Zubaydah had independently seen the same site, and thought it was serious.  When the American agents heard these two separate stories, they thought that Abu Zubaydah was telling the truth and the "combative" Mr. Mohamed was lying.  They wanted to make Mr. Mohamed tell the truth.  This was the basis for his rendition.

C.  **THE REASONABLE NATURE OF THIS DISCOVERY**

Respondent tries to make out that Petitioner's requests are overbroad. *Respondent's Opposition at 6* ("all information concerning the details of his custody since 2002 would be exculpatory in [the] context of his habeas case"); *id. at 8* (characterizing the requested discovery as "essentially open-files discovery"). This is false. Petitioner would expect Lt. Col. Vandeveld to confirm in his deposition that Respondent has "thousands" of documents concerning Petitioner, all of which the OMCP long since reviewed.  Petitioner is not seeking access to them all.  However, to the extent that documents reflect (a) that he was rendered, (b) that he was tortured and abused, (c) that he was illegally held in each location, and (d) that he made inconsistent statements because of the coercive nature of these interrogations, then they are most certainly exculpatory and subject to the Court's order.

Respondent insists that certain legal questions are "irrelevant to this habeas case." *Respondent's Opposition at 7 & n. 5*.  The example given is a very bad choice. Respondent states that it is irrelevant to this Court that Petitioner was held illegally in Pakistan.  Yet this is the very basis for the British courts to hold that the British intelligence service, which interviewed Mr. Mohamed there, was complicit in wrongdoing, and therefore had a legal obligation to help to return him to the *status quo ante*.[28]

Yet if there is a particular query made by Petitioner where Respondent is concerned about relevance, all counsel need do is pick up the telephone, or send an e-mail.  If Petitioner's

---

[28] The British High Court's reasoning is compelling.  The Court found that Petitioner was illegally held in Pakistan, and that the Pakistani rules of procedure were not applied, thereby failing to lend Mr. Mohamed the legal protection that was his right.  The fact that the British (and, even more so, the US) exploited this illegality to coerce and abuse Petitioner is one of the many factors that go to the admissibility of his statements.  Whether this Court chooses to follow the lead of the British High Court will be the subject of debate at a later stage, but for Respondent to argue that this is irrelevant at the discovery stage is a difficult sell.

explanation does not satisfy Respondent, he would be free to bring his complaint to this Court. But Petitioner has only one interest – the expeditious and fair consideration of his case.

### D.  THE SENSIBLE USE OF THE TOOLS OF DISCLOSURE.

As Petitioner has previously detailed, he has tried to use the tools of discovery in a targeted and sensible way.  In compliance with this Court's direction, he submits modified versions of the discovery requests he served on Respondent on the date set out in the plan.

If Respondent is forthright, Requests for Admission can radically limit the need for other discovery.  These are attached as *Exhibit A.*  These are easily answered with a simple Yes/No.

Interrogatories are the second most efficient method of discovery, and will identify some of the witnesses who should be subjected to other means of disclosure.  Proposed interrogatories are attached as *Exhibit B* (reduced to meet the limit, pursuant to Respondent's complaint).

The request for production of documents should perhaps be considered next.  Mr. Mohamed can be quite specific about the areas of disclosure that should be made in the case. Indeed, this Court has ordered most of these disclosures once – Respondent has simply flouted the Court order.  These are attached as *Exhibit C.*  These documents should be readily available.

Depositions by Written Questions are the next least intrusive method of disclosure.  Some of these cannot be drawn up until Respondent responds to his other requests.  However, samples of such Depositions are included as *Exhibit D.*

None of this excuses Respondent from complying with this Court's previous order to provide exculpatory information.  Mr. Mohamed obviously does not know of all the exculpatory information in Respondent's possession, but that does not eliminate the Government's obligation to do justice.

In some cases, Mr. Mohamed has made the relevance of these requests clear with footnotes.  This should not be necessary, particularly as Mr. Mohamed has previously made many of the same observations in letters to Respondent's counsel, but he is simply trying to avoid further obfuscation of the issues.  He is, again, totally open to Respondent calling at any time to discuss the requested items.

E.  **THE REASONABLE TIMING OF THIS DISCOVERY**

Respondent accuses Petitioner of allowing an "unrealistic amount of time" for discovery.  *Respondent's Opposition at 1.*  Respondents complain that seven days are not enough to reply to Requests for Admission – which require a simple yes/no answer.  *Respondent's Opposition at 2.*  It is worth noting that this took counsel just two hours to complete, and counsel could reply to them all in 30 minutes.  Be that as it may, Respondent now has an extra 12 days prior to the hearing to compile the responses – a total of nearly three weeks.  Why is that unreasonable, given that honest responses could largely eliminate the need for other discovery or even a hearing?

Given that time has already gone by since the last hearing, Petitioner submits a *revised* general timetable for discovery:

| Date | Event |
| --- | --- |
| Nov. 12, 2008 | Formal service of Petitioner's (attached) Requests for Admission, Interrogatories, Request for Production of Documents & other Tangible Objects, and initial Depositions on Written Questions. |
| Nov. 19, 2008 | Respondent's responses due with respect to Requests for Admission. |
| Dec. 12, 2008 | Respondent's responses due with respect to Interrogatories, Request for Production of Documents & other Tangible Objects, and initial Depositions on Written Questions. |
| Jan. 12, 2009 | Petitioner's follow-up discovery requests due. |
| Feb. 12, 2009 | Petitioner's Traverse to Amended Factual Return due. |

| Mar. 14, 2009 | Respondent's discovery requests due. |
|---|---|
| Apr. 13, 2009 | Petitioner's preliminary responses to Respondent's discovery requests.[29] |
| April 27, 2009 | Respondent's follow-up discovery requests due. |
| June 1, 2009 | Dispositive motions due. |

Respectfully submitted,

/s/ Clive Stafford Smith                      .
Cori Crider
Ahmed Ghappour
Zachary P. Katznelson
Clive A. Stafford Smith
Reprieve
PO Box 52742
London EC4P 4WS
United Kingdom
011 44 207 353 4640

*Counsel for Petitioner Mohamed*

November 6, 2008

---

[29] Petitioner intends to reply under the same timeframe (14 days). However, due to the difficulty of access to Petitioner (occasioned by Respondent detaining him in Cuba), replies that necessitate his direct involvement may take longer. However, Petitioner will work with Respondent to facilitate immediate access to Petitioner, and resolve Respondent's issues about the handling of classified evidence, in an effort to meet the expedited deadline for all discovery.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2008 I electronically filed and served the foregoing document: *Petitioner's Reply to Respondent's Opposition to Motion To Compel Compliance With This Court's Order And Proposed Discovery Schedule.*


**<u>/s/ Cori Crider</u>**
Cori Crider