## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE:**<br><br>**PETITIONERS SEEKING HABEAS CORPUS RELIEF IN RELATION TO PRIOR DETENTIONS AT GUANTANAMO BAY** | **Misc. No. 08-0444 (TFH)**<br><br>**Civil Action Nos.**<br><br>**02-cv-1130, 04-cv-1135, 04-cv-1144, 04-cv-1194, 04-cv-1227, 04-cv-1254, 05-cv-0023, 05-cv-0345, 05-cv-0490, 05-cv-0520, 05-cv-0526, 05-cv-0584, 05-cv-0586, 05-cv-0640, 05-cv-0714, 05-cv-0723, 05-cv-0764, 05-cv-0765, 05-cv-0878, 05-cv-0833, 05-cv-0887, 05-cv-0888, 05-cv-0891, 05-cv-0998, 05-cv-1001, 05-cv-1009, 05-cv-1124, 05-cv-1237, 05-cv-1242, 05-cv-1243, 05-cv-1246, 05-cv-1311, 05-cv-1487, 05-cv-1493, 05-cv-1505, 05-cv-1509, 05-cv-1635, 05-cv-1667, 05-cv-1678, 05-cv-1714, 05-cv-1779, 05-cv-1806, 05-cv-1864, 05-cv-2029, 05-cv-2104, 05-cv-2197, 05-cv-2216, 05-cv-2336, 05-cv-2367, 05-cv-2369, 05-cv-2384, 05-cv-2385, 05-cv-2386, 05-cv-2452, 05-cv-2458, 05-cv-2466, 05-cv-2479, 06-cv-1675, 06-cv-1677, 06-cv-1678, 06-cv-1679, 06-cv-1683, 06-cv-1687, 06-cv-1763, 06-cv-1768, 06-cv-1769, 08-cv-0864, 08-cv-1104, 08-cv-1185, 08-cv-1221, 08-cv-1223, 08-cv-1628, 08-cv-1733** |

## <u>MEMORANDUM OPINION</u>

Before the Court are 105 habeas petitions from aliens who were detained at the United States Naval Base in Guantanamo Bay, Cuba ("Guantanamo") and have since been transferred or released to a foreign country.  Their petitions raise one of the many questions left unanswered by the United States Supreme Court in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008) — what happens to a Guantanamo detainee's habeas claim once he is transferred or released.  Although *Boumediene* held that aliens detained at Guantanamo have the privilege of habeas corpus, *id.* at 2262, the Supreme Court did not expound on the privileges of those detainees once they leave Guantanamo.  Such issues were left to "the expertise and competence of the District Court to address in the first instance." *Id.* at 2276.  Subsequently, this Court, pursuant to its authority as the coordinator and manager of habeas cases involving Guantanamo detainees, ordered former

Guantanamo detainees with pending habeas petitions ("Petitioners") and the United States Government ("Respondents") to each file a consolidated brief addressing whether the United States District Court for the District of Columbia's "jurisdiction over a habeas corpus petition filed by a foreign national detained at Guantanamo Bay, as recognized in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), is eliminated by the petitioner's transfer or release from Guantanamo Bay." Order (Jan. 12, 2009) [Dkt. No. 79].

Upon consideration of the multiple briefs filed by the parties, the 105 habeas petitions, as well as the entire record herein, the Court finds that the District Court no longer has jurisdiction over Petitioners' habeas petitions. Petitioners are no longer in United States custody and fail to demonstrate that they suffer from collateral consequences of their prior detention that the Court can remedy. Accordingly, the Court will dismiss their habeas claims as moot.

## BACKGROUND

Petitioners are 105 aliens who share a basic set of facts. *See* Joint Status Report (Nov. 9, 2009) [Dkt. No. 109]; Sealed Joint Status Report (Nov. 9, 2009) [Dkt. No. 110]; Errata to Joint Status Report (Dec. 11, 2009) [Dkt. No. 116].[1] The United States Government detained them at Guantanamo and later transferred or released them to various foreign countries. *See* Pet'rs' Br. at 19-20 (Feb. 6, 2009) [Dkt. No. 89]. While detained at Guantanamo, each alien petitioned the United States District Court for the District of Columbia for a writ of habeas corpus.

On July 12, 2008, the Supreme Court held that the Suspension Clause "of the Constitution has full effect at Guantanamo Bay." *Boumediene*, 128 S. Ct. at 2262. Thus, the

---

[1] There are a limited number of former Guantanamo detainees whose habeas petitions are not pending before this Court under Miscellaneous Action No. 08-0444. The majority of those petitioners were transferred or released from Guantanamo in the past four months.

aliens detained at Guantanamo "are entitled to the privilege of habeas corpus to challenge the legality of their detention." *Id.* The decision marked the first time the Supreme Court has "held that noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty have any rights under our Constitution." *Id.* Later in the opinion, the Supreme Court concluded that the process Guantanamo detainees receive under the Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2739, is not an adequate substitute for habeas review. *Id.* at 2262-74. Accordingly, the language in § 7 of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-336, 120 Stat. 2600, eliminating habeas review for Guantanamo detainees "operates as an unconstitutional suspension of the writ." *Id.* at 2240. In the MCA's absence, the Supreme Court indicated that Guantanamo detainees are entitled to petition for habeas corpus under the federal habeas corpus statute, 28 U.S.C. § 2241. *Id.* at 2266; *see also Rasul v. Bush*, 542 U.S. 466, 481 (2004) (holding that aliens being held at Guantanamo "are entitled to invoke the federal courts' authority under § 2241"). In order to reduce administrative burdens, the Supreme Court allowed the Government to consolidate review of the Guantanamo detainees' habeas petitions in the United States District Court for the District of Columbia. *Boumediene*, 128 S. Ct. at 2276.

On July 1, 2008, the District Court resolved by Executive Session to designate the undersigned "to coordinate and manage proceedings in all cases involving petitioners previously detained at Guantanamo Bay, Cuba, so that these cases can be addressed as expeditiously as possible per the Supreme Court's decision in *Boumediene*." Order at 2 (July 3, 2008) [Dkt. No. 1]. Though former detainees were not explicitly mentioned in *Boumediene*, the habeas privilege described in the decision applies to their claims. The federal habeas statute requires that a

habeas petitioner be "in custody under or by color of the authority of the United States." 28

U.S.C. § 2241(c)(1) (2008).  This requirement is satisfied if the petitioner was in United States

custody "at the time the petition was filed."  *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).  At the

time they filed their habeas claims, Petitioners were in the physical custody of the United States

at Guantanamo, where the Suspension Clause "has full effect," *Boumediene*, 128 S. Ct. at 2262.

Petitioners therefore initially met this minimum statutory threshold.

Nevertheless, Petitioners' new circumstances raise the issue of mootness.  When

Petitioners filed their habeas claims, the relief requested was clear — release from United States

custody at Guantanamo.  Now, Petitioners no longer seek release from Guantanamo since they

have been transferred or released abroad.  *See* Pet'rs' Supp. Reply at 5-7 (Nov. 20, 2009) [Dkt.

No. 114].  Instead, Petitioners ask the Court to secure their release from foreign sovereigns, void

agreements between the United States Government and foreign sovereigns that impose

restrictions on them, or invalidate the United States Government's prior determination that they

are enemy combatants.  *Id.*  But the federal courts are not necessarily able to provide such relief.

As the Supreme Court explained in *Munaf v. Geren*, decided the same day as *Boumediene*,

"[h]abeas is at its core a remedy for unlawful executive detention.  The typical remedy for such

detention is, of course, release."  128 S. Ct. 2207, 2221 (2008) (internal citations omitted).

In its role as manager and coordinator of these petitions, this Court is tasked with

resolving whether the petitions are now moot.  On January 12, 2009, the Court ordered

Petitioners and Respondents to each file a consolidated brief addressing whether the District

Court maintains habeas jurisdiction over the petitions of Guantanamo detainees who have been

released or transferred to a foreign country.  "[A] mootness issue quite clearly can be raised sua

sponte if not addressed by the parties." *Sannon v. United States*, 631 F.2d 1247, 1250 (5th Cir. 1980). The federal habeas statute is also unambiguous that a federal court may dismiss a habeas claim sua sponte if "it appears from the [habeas] application that the applicant or person detained is not entitled" to the writ. 28 U.S.C. § 2243. On February 6, 2009, the parties filed consolidated briefs. On February 23, 2009, each party filed a consolidated reply brief. During the course of the Court's deliberation, the United States Court of Appeals for the District of Columbia Circuit issued multiple opinions interpreting *Boumediene* and clarifying the substantive and procedural habeas rights of Guantanamo detainees. Subsequently, the Court requested and received supplemental briefing from the parties.[2]

## ANALYSIS

The question before the Court is not whether the District Court initially had jurisdiction over Petitioners' habeas claims, which was decided by *Boumediene*, but whether it still has jurisdiction over the claims. Mootness is a concern for any petitioner with a pending habeas claim who is released from United States custody. At all times during federal judicial proceedings, a party must present "a case or controversy under Article III, § 2, of the Constitution." *Spencer*, 523 U.S. at 7.[3] Otherwise, the party's claim is moot. For a petitioner in United States custody, the controversy is clear since he is attempting to secure his release from

---

[2] The Court also reviewed and considered any motions to dismiss a habeas petition as moot that Respondents filed in these cases, as well as oppositions to those motions.

[3] "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States." U.S. CONST. art. III, § 2.

the United States Government.  *Id.*  For a petitioner released from United States custody, the

case-or-controversy requirement is problematic because the remedy sought is more elusive.

Under habeas common law, a petitioner no longer in custody can prove he continues to present a

live case or controversy by demonstrating he suffers "some concrete and continuing injury other

than the now-ended incarceration . . . some 'collateral consequence' of the conviction" that is

"likely to be redressed by a favorable judicial decision."  *Id.* (citations and quotations omitted).

Petitioners address this mootness inquiry in two ways.  First, they cite to the federal

habeas statute, 28 U.S.C. § 2241.  Under § 2241(c), the writ of habeas corpus extends to

petitioners who are in United States custody.  Some Petitioners aver that although they are no

longer physically detained by the United States at Guantanamo, they are being detained by

foreign governments at the behest of the United States.  This constructive custody, they argue,

satisfies that statute's custody requirement, thereby obviating the need for a mootness inquiry.

Second, regardless of whether they remain in custody, Petitioners claim they all suffer from

collateral consequences of their prior detention at Guantanamo that are concrete and redressable

by a federal court.  Thus, despite their release, Petitioners argue that they continue to present a

live case or controversy under Article III, § 2.

A.      "In Custody"

Petitioners claim that some former detainees remain in custody of the United States under

the federal habeas statute, even though they are no longer in the physical custody of the United

States at Guantanamo.  Petitioners posit that if they remain in United States custody, there is no

need for a mootness inquiry.  *See* Pet'rs' Reply at 10 (Feb. 23, 2009) [Dkt. No. 94].  Custody and

jurisdiction are intertwined under the habeas statute.  Section 2241 provides that the writ of

habeas corpus does not extend to a detainee unless he is "in custody" either "under or by color of the authority of the United States," "in violation of the Constitution or law or treaties of the United States," or in several other respects that the parties do not claim are relevant here.  28 U.S.C. § 2241(c).  Consistent with this broad language, "courts have universally held that actual physical custody of an individual by the respondent is unnecessary for habeas jurisdiction to exist." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 47 (D.D.C. 2004)).  Rather, the statute provides "for habeas jurisdiction where the official possesses either actual or 'constructive' custody of the petitioner." *Id.* (citing *LoBue v. Christopher*, 82 F.3d 1081, 1082 (D.C. Cir. 1996)).  To be found in the constructive custody of the United States within the meaning of the habeas statute, the burden is on the petitioner to establish that "the respondent was responsible for significant restraints on the petitioner's liberty." *Abu Ali*, 350 F. Supp. 2d at 48.

A subset of Petitioners allege they are in constructive custody of the United States. Though these Petitioners were "transferred from Guantanamo to the custody of other nations," they "claim that their continued physical detention by those nations is directed by or otherwise at the behest of the United States."  Pet'rs' Br. at 5.  Petitioners are short on examples, except for the fact that former Guantanamo detainees from Afghanistan transferred back to Afghanistan have been detained at a detention facility built by the United States.  *Id.*  Petitioners lean on *Abu Ali* for the notion that the District Court continues to have habeas jurisdiction over individuals detained by foreign powers at the behest of the United States.  *See id.* at 6-7.  In *Abu Ali*, a United States citizen alleged he was being detained in a Saudi Arabian prison "at the behest and ongoing supervision of the United States." *Abu Ali*, 350 F. Supp. 2d at 30.  The District Court concluded that the petitioner was entitled to "expeditious jurisdictional discovery . . . to further

explore those contentions."  *Id.*

Respondents disclaim responsibility for the Petitioners' continued detention.  In support,

Respondents submit the declaration of Deputy Assistant Secretary of Defense Sandra L.

Hodgkinson, which explains that "[i]n all cases of transfer, the detainee is transferred entirely to

the custody and control of the other government, and once transferred, is no longer in the

custody and control of the United States."  Hodgkinson Decl. ¶ 5, July 9, 2008.  If subsequent to

the transfer the individual is detained, the detention is "by the foreign government pursuant to its

own laws and not on behalf of the United States." *Id.*; *see also* Decl. of Clint Williamson, United

States Ambassador-at-Large for War Crimes Issues, ¶ 6, June 8, 2007 (before transferring a

detainee the United States engages in discussions with the foreign government concerned "to

learn what measures the receiving government is likely to take to ensure that the detainee will

not pose a continuing threat to the United States or its allies").  With respect to the Afghani

detainees transferred to an Afghani detention center, according to the declaration of Lieutenant

Colonel David F. Koonce, Director of the Detainee Capabilities Directorate for the Combined

Security Transition Command-Afghanistan, the United States has no control over the disposition

of detainees transferred there, nor does it have control over the implementation and enforcement

of any specific security measures.  Koonce Decl. ¶¶ 6-7, Oct. 31, 2008.  Rather, such decisions

are within the sole discretion of the Afghanistan government under its domestic laws.  *Id.*

Juxtaposed with the Government declarations, Petitioners' blanket allegations are not

sufficient to prove that the United States is responsible for their continued detention.  In *Kiyemba*

*v. Obama*, based on a Government declaration that mirrors the declarations here, the District of

Columbia Circuit concluded that detainees cannot "prevail on the ground that [a] foreign

8

sovereign is an agent of the United States merely because . . . the Government engages in a dialogue to ascertain or establish what measures the receiving government intends to take pursuant to its own domestic laws."  561 F.3d 509, 515 n.7 (D.C. Cir. 2009) ("*Kiyemba II*") (citations and quotations omitted), *cert. denied*, 2010 WL 1005960 (U.S. Mar. 22, 2010); *see also Kiyemba II*, 561 F.3d at 521 (Kavanaugh, J., concurring) (stating the declaration suffices "to demonstrate that the proposed transfer of an alien to the custody of a foreign national is not the same thing as the U.S. Government's maintaining the detainee in U.S. custody").  In view of that declaration, the Circuit Court had "no reason to think the transfer process may be a ruse – and a fraud on the court – designed to maintain control over the detainees beyond the reach of the writ."  *Id.*  The Supreme Court has also provided that courts are "not suited to second-guess" such Government representations.  *Munaf*, 128 S. Ct. at 2226.  Following the direction of the appellate courts, this Court fully credits the Government declarations.  Accordingly, the Court accepts that foreign governments, not the United States Government, are responsible for any continuing restraints on Petitioners' liberty.

        *Abu Ali*, on which Petitioners rest the bulk of their "in custody" argument, Pet'rs' Br. at 6-7, is inapposite.  The petitioner, Abu Ali, provided detailed, extensive evidence that the "United States orchestrated [his] detention and was intimately involved from the very beginning."  *Abu Ali*, 350 F. Supp. 2d at 30-38.  Saudi Arabian officials even "acknowledged publicly that the United States has been involved throughout his detention, and have told United States officials that they would release Abu Ali at the request of the United States." *Id.* at 38.  The United States did not rebut those allegations, instead seeking to dismiss the petition "on the theory that a federal court lacks jurisdiction to issue a writ of habeas corpus where the prisoner is

currently being held by a foreign custodian, no matter what role the Untied States allegedly has played in his detention." *Id.* at 37.  In contrast, there is no evidence that the United States exerts this level of control over Petitioners.  Respondents provide Government declarations establishing that the United States relinquishes custody of detainees when they are transferred or released from Guantanamo to a foreign country.[4]

Furthermore, Petitioners miscast the holding in *Abu Ali*.  The District Court did not conclude that Abu Ali was in United States custody.  *Id.* at 50.  Rather, it rejected the Government's contention that a federal court has no jurisdiction to consider the habeas petition of an individual in the hands of a foreign state.  *Id.* at 31.  In denying the Government's motion to dismiss for lack of habeas jurisdiction, the District Court authorized additional discovery to explore the petitioner's unrebutted pleadings.  *Id.*  Such discovery was justified by the Government's reticence.  Far from concluding that individuals detained abroad at the behest of the United States are in constructive custody, the District Court cautioned that "[t]he instances where the United States is correctly deemed to be operating through a foreign ally as an intermediary for purposes of habeas jurisdiction will be exceptional, and a federal court's inquiry in such cases will be substantially circumscribed by the separation of the powers."  *Id.* at 41. Here, Respondents do not make the same broad assertions that federal courts lack of jurisdiction, choosing instead to directly rebut Petitioners' allegations with Government declarations.  Based on those declarations, the Court sees no need for additional inquiry into the matter.

Therefore, the Court finds that petitioners are no longer "in custody" of the United States.

---

[4]  It bears noting that Abu Ali was a United States citizen whereas Petitioners are aliens. As the District Court explained in *Abu Ali*, in the context of habeas challenges to detention by a foreign government, "[t]he differences between the rights of citizens and the rights of aliens are considerable."  *Abu Ali*, 350 F. Supp. 2d at 55.

*Cf. Al Hajji v. Obama*, 2009 WL 4251108, at *1-2 (D.D.C. Nov. 23, 2009) (holding that, based on the Hodgkinson Declaration, former detainees are not in the constructive custody of the United States).  Petitioners' general allegations of constructive custody do not satisfy their burden, especially in light of credible Government attestations to the contrary. Since none of the Petitioners remain "in custody" under the habeas statute, they all must rely on the collateral consequences of their prior detention in order to preserve their habeas claims.

B.    Collateral Consequences Doctrine

Mootness is a glaring issue for habeas petitioners who have been released from United States custody.  At all stages of federal judicial proceedings, a habeas petitioner must present a live case or controversy under Article III, §2, of the Constitution.  *Spencer*, 523 U.S. at 7.  Under common law, a petitioner no longer in custody can meet this case-or-controversy requirement by demonstrating he suffers from collateral consequences of his prior detention that are "concrete" and "'likely to be redressed by a favorable judicial decision.'"  *Id.* at 7 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).   The petitioner bears the burden of establishing such collateral consequences.  *See, e.g., Zalawadia v. Ashcroft*, 371 F.3d 292, 297 (5th Cir. 2004) (stating that "for a court to exercise habeas jurisdiction over a petitioner no longer in custody, the petitioner must demonstrate . . . that he continues to present a case or controversy under Article III, § 2"); *Qassim v. Bush*, 466 F.3d 1073, 1078 (D.C. Cir. 2006) (same); *Idema v. Rice*, 478 F. Supp. 2d 47, 51 (D.D.C. 2007) ("The petitioner bears the burden of establishing collateral consequences.").[5]

---

[5] Petitioners argue that the burden of establishing mootness should fall on the Government, analogizing to habeas challenges to criminal convictions where the existence of collateral consequences are presumed.  *See* Pet'rs' Br. at 4.  Although in the context of criminal convictions collateral consequences are in fact presumed, the Supreme Court has not extended that presumption to other habeas contexts.  *See Spencer*, 523 U.S. at 10-14.  To the contrary, in

According to Petitioners, this common law exception to the custody requirement – the collateral consequences doctrine – applies to Guantanamo detainees.[6]  Petitioners allege they suffer from a variety of harms that are both concrete and redressable.  Rather than identify which Petitioners suffer from which harm, they provide a comprehensive list of consequences affecting

_____

*Spencer* the Supreme Court expressed unease with such presumptions.  *Id.* at 10-11.  Moreover, the Circuit Court has held that "[h]abeas review for Guantanamo detainees need not match the procedures developed by Congress and the courts specifically for habeas challenges to criminal convictions."  *Al-Bihani*, 590 F.3d at 877.  Accordingly, the Court declines to extend a presumption to Petitioners' allegations of collateral consequences.

[6] Petitioners contend that since federal courts apply the collateral consequences doctrine to petitioners in other habeas contexts, it should apply to them.  *See, e.g.,* Pet'rs' Br. at 17 ("[I]t is well-settled law that so long as there is a risk that petitioner will suffer some collateral consequences as a result of some aspect of his unlawful custody, his case will not become moot simply because he is no longer in 'custody.'").  Respondents concede as much.  *See* Resp'ts' Supp. Br. at 2.  For the purposes of this opinion, the Court need not question that assumption.
    Nevertheless, the Court notes that *Boumediene* restricted Guantanamo detainees' habeas privilege to the "fundamental procedural protections of habeas corpus."  *Boumediene*, 128 S. Ct. at 2277; *see also Al-Bihani*, 590 F.3d at 875-76.  Specifically, the Supreme Court enumerated two fundamental habeas procedures: (1) a habeas petitioner is entitled to "a meaningful opportunity to demonstrate he is being held" unlawfully and (2) "the habeas court must have the power to order the conditional release of an individual unlawfully detained."  *Boumediene*, 128 S. Ct. at 2266-67.  Both of these "fundamental procedural protections" are seemingly inapposite to the collateral consequences doctrine.  The doctrine does not provide a petitioner "a meaningful opportunity to demonstrate he is being held" unlawfully because the doctrine only applies to petitioners who are no longer being held.  Nor does the doctrine allow a habeas court to "order the conditional release of" a petitioner since the doctrine only applies to petitioners who have already been released from United States custody.  There thus is no indication that the doctrine would be construed as "fundamental" under the only habeas procedures the Supreme Court conspicuously afforded to Guantanamo detainees.
    Directly undermining Petitioners' position, the District of Columbia Circuit explicitly rejected the notion that Guantanamo detainees are entitled to the panoply of habeas rights afforded to petitioners in other contexts.  In *Al-Bihani*, the Circuit Court stated that "[h]abeas review for Guantanamo detainees need not match the procedures developed by Congress and the courts specifically for habeas challenges to criminal convictions. . . . [A]ny argument equating [the] fundamental character [of habeas proceedings] with all the accroutements of habeas for domestic criminal defendants is highly suspect."  590 F.3d at 876.  Here, Petitioners cite to procedures developed by the courts for habeas challenges to criminal convictions – the collateral consequences doctrine.  It is thus unclear whether habeas review for Guantanamo detainees needs to include the doctrine.

the group as a whole.  Collectively, because of their prior detention at Guantanamo, Petitioners

are allegedly detained abroad, subject to travel restrictions, stigmatized, prohibited from

traveling to the United States, and barred from seeking civil damages.  The Court finds, however,

that each of these consequences is not redressable by a federal court.  Moreover, some of them

are speculative.

       *i.*     *Conditions imposed by foreign governments*

       Foremost among Petitioners' alleged collateral consequences are restrictions imposed on

them as a result of agreements between foreign governments and the United States Government.

A number of Petitioners aver that because of those agreements they are being physically detained

or subject to restrictions by their host foreign governments.  *See* Pet'rs' Br. at 7-13.  Their

allegations are primarily derived from declarations that describe commitments the United States

Government requires before transferring a detainee.  According to Clint Williamson, United

States Ambassador-at-Large for War Crimes Issues, detainees were transferred to their foreign

governments of nationality "when those governments were willing to accept responsibility for

ensuring, consistent with their laws, that the detainees will not continue to pose a threat to the

United States and its allies."  Williamson Decl. ¶ 3.  In a separate declaration, Joseph Benkert,

Principal Deputy Assistant Secretary of Defense for Global Security Affairs, explains that the

United States Government engages in diplomatic dialogue with receiving governments "to

ascertain or establish what measures the receiving government intends to take, pursuant to its

own domestic laws and independent determinations."  Benkert Decl. ¶ 5, June 8, 2007.

Petitioners posit that some of these measures are predicated on a former detainee's prior status as

an enemy combatant.[7]  Pet'rs' Br. at 13.  Whereas some Petitioners are prohibited from traveling

outside of their host countries, a group of former detainees who were determined to no longer be

enemy combatants by Combatant Status Review Tribunals[8] and subsequently transferred to

Albania are allegedly allowed to travel internationally without restriction.  *Id.*

According to Petitioners, these conditions are concrete and redressable consequences of

their prior detention.  The injuries are not speculative because some Petitioners remain in

detention, while others endure overt restrictions on their activity.  Pet'rs' Br. at 13-15.  A remedy

is also well within a federal court's authority, Petitioners' contend – the District Court can

simply invalidate the agreements between the United States and the foreign governments.

Pet'rs' Reply at 12, 18; Pet'rs' Supp. Reply at 6-7.  To the extent the restrictions are predicated

on the United States Government's prior determinations that Petitioners are enemy combatants,

the District Court can annul those determinations.  Pet'rs' Br. at 13-15.

Petitioners, however, inflate the District Court's authority.  Collateral consequences of

---

[7] The Government no longer uses the term "enemy combatant," instead asserting,

> The President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

Resp'ts'  Mem. Regarding the Gov't's Detention Authority Relative to Detainees Held at Guantanamo, *Zuhair v. Obama*, No. 08-0864 at 2 (Mar. 13, 2009)  [Dkt. No. 160] ("Resp'ts' Mem. on Detention Authority").

[8] The Defense Department established Combatant Status Review Tribunals "to determine whether individuals detained at Guantanamo were 'enemy combatants.'"  *Boumediene*, 128 S. Ct. at 2241.

prior detention are not redressable if the injuries are "totally dependent upon the actions of a non-party sovereign authority beyond the control of this Court." *Al Joudi v. Bush*, 2008 WL 821884, at *1 (D.D.C. Mar. 26, 2008); *see also Al Hajji*, 2009 WL 4251108, at *2 ("collateral consequences that are 'based on the discretionary decisions of' someone other than respondents, alone, effectively renders [a] case moot" (quoting *Spencer*, 523 U.S. at 13)).  Taking for granted that Petitioners are subject to the conditions they allege, the very declarations that Petitioners rely upon evidence the District Court's lack of authority.  The Benkert Declaration indicates that measures taken by a receiving government are made "pursuant to its own domestic law and independent determinations." Benkert Decl. ¶ 5.  In other words, a "detainee is transferred entirely to the custody and control of the other government, and once transferred, is no longer in the custody and control of the United States; the individual is detained, if at all, by the foreign government pursuant to its own laws and not on behalf of the United States." *Id.; see* Hodgkinson Decl. ¶ 5 (stating that detention by a foreign government is made "by the foreign government pursuant to its own laws and not on behalf of the United States").  The assurances that foreign governments provide to the United States Government that Ambassador Williamson describes are made "consistent with [the foreign sovereign's] laws."  Williamson Decl. ¶ 3.

Petitioners attack the above portions of the Government's declarations while simultaneously embracing language from those documents that ostensibly support their claim. The Court, however, declines to cherry-pick.  The District of Columbia Circuit has attested to the validity of Government declarations that transferred detainees are detained by "foreign government[s] pursuant to [their] own laws and not on behalf of the United States." *Kiyemba II*, 561 F.3d at 515 n.7 (quoting Decl. of Matthew C. Waxman, Deputy Assistant Secretary of Defense for Detainee Affairs, ¶ 5, June 2, 2005).  Following the Circuit Court's lead, this Court

has "no reason to think the transfer process may be a ruse – and a fraud on the court – designed to maintain control over the detainees beyond the reach of the writ." *Kiyemba II*, 561 F.3d at 515 n.7. The Court is "not suited to second-guess" those Government representations, as it would "undermine the Government's ability to speak with one voice in this area." *See Munaf*, 128 S. Ct. at 2226. Thus, the Court accepts that conditions imposed on Petitioners by foreign governments are made "pursuant to [their] own domestic law and independent determinations," Benkert Decl. ¶ 5. Since the conditions are "totally dependent upon the actions of a non-party sovereign authority," *Al Joudi*, 2008 WL 821884, at *1, they do not preserve Petitioners' habeas claims.

Put differently, even if the Court granted Petitioners the relief they seek, such a ruling would not preclude foreign governments "from taking all of the actions that Petitioners fear." *Id.* The Court "has no authority over the foreign governments currently holding" Petitioners. *See Al Hajji*, 2009 WL 4251108, at *2. "It is a longstanding principle of our jurisprudence that '[t]he jurisdiction of [a] nation, within its own territory, is necessarily exclusive and absolute.'" *Kiyemba II*, 561 F.3d at 515 (quoting *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812)). For this reason, the District Court is barred from issuing "a writ of habeas corpus to shield a detainee from [potential] prosecution or detention at the hands of another sovereign on its soil and under its authority." *Kiyemba II*, 561 F.3d at 516; *see also Munaf*, 128 S. Ct. at 2224 (explaining that "the same principles of comity and respect for foreign sovereigns that preclude judicial scrutiny of foreign convictions necessarily render invalid attempts to shield citizens from foreign prosecutions" (citation omitted)). "Judicial inquiry into a recipient country's basis or procedures for prosecuting or detaining a transferee from Guantanamo would implicate not only norms of international comity but also . . . separation of powers principles." *Kiyemba II*, 561

F.3d at 515.  If the Court cannot grant relief based on a detainee's expectation that a recipient

country will detain him, then it necessarily follows that the Court can grant no relief to

petitioners who are no longer in United States custody and whose disposition is entirely within

the discretion of a foreign sovereign.  Quite simply, Petitioners have not demonstrated that

granting their habeas claims would terminate any conditions imposed on them by their host

foreign governments.  Because the federal courts are powerless to redress those conditions, they

do not save Petitioners' habeas claims from being moot.

> ii.    Stigma

Petitioners complain of "stigmatic consequences" of having been labeled an enemy

combatant by the United States Government.  *See* Pet'rs' Br. at 20-23.  They cite to

characterizations by Government officials that Guantanamo detainees are the "worst of the

worst."  *Id.* at 20 (quoting Katharine Seelye, *Some Guantanamo Prisoners Will Be Freed,

Rumsfeld Says*, N.Y. TIMES, Oct. 23, 2002, at A14).  Though not describing the stigma in detail,

Petitioners aver that their reputations have been damaged.  *See* Pet'rs' Supp. Br. Ex. A at 13

(Pet'r's Opp. to Resp'ts' Mot. to Dismiss as Moot Habeas Petition, *Zuhair v. Obama*, No. 08-

0864 (Aug. 3, 2009)) (Nov. 10, 2009) [Dkt. No. 112].  The District Court can remedy the harm,

Petitioners contend, by voiding the Government's prior determination that Petitioners were enemy

combatants.  *Id.* at 17.

Clarifying what collateral consequences present a live case or controversy, the Supreme

Court has limited post-detention habeas relief to "'civil disabilities' imposed on former detainees

by operation of law."  *Idema*, 478 F. Supp. 2d at 52 (quoting *Lane v. Willians*, 455 U.S. 624, 631-

33 (1982)).  Non-statutory consequences of a conviction such as loss of "employment prospects,

or the sentence imposed in a future criminal proceeding" are not redressable by a federal court,

and are often speculative, since they depend on the "discretionary decisions" of others.  *See Lane*, 455 U.S. at 632-33.  For this reason, the Supreme Court has not regarded damage to reputation as sufficient to avoid mootness, even when the damage stems from a criminal conviction.  *See Spencer*, 523 U.S. at 16 n.8.

The stigmatic consequences allegedly affecting Petitioners are not imposed by operation of law.  Petitioners present no evidence that the damage to their reputations is statutorily prescribed.  Nor do Petitioners demonstrate how their general allegations of stigma present a concrete injury, as opposed to mere speculation.  Under similar circumstances, the District Court dismissed as moot a habeas petition relying on reputational harm to maintain jurisdiction.  *Idema*, 478 F. Supp. 2d at 50-52.  In *Idema*, the petitioner, a United States citizen, accused the United States of complicity in his torture, conviction for various crimes, and imprisonment in Afghanistan.  *Id.*  Though released from prison and not in United States custody, the petitioner filed a habeas claim alleging that his imprisonment in Afghanistan harmed his "professional reputation" and denied him core parental rights over his daughter.  *Id.* at 51-52.  Noting that injury to ones professional reputation was "based on the discretionary decisions of employers" and not "legally prescribed," the District Court held that the alleged collateral consequences did not present a "legally cognizable reason for this Court to maintain jurisdiction" over the petitioner's habeas claim.  *Id.* at 52.  The stigma alleged by Petitioners is no different.  Any harm or injuries are "based on the discretionary decisions" of non-parties and not "legally prescribed." In fact, extending the writ is even less compelling here since Petitioners are not United States citizens.

Attempting to distinguish *Idema*, Petitioners suggest that the reputational harm alleged in that case was only deemed not redressable because the remedy would have required a federal

court to "declare void the judgment of [a] foreign tribunal."  Pet'rs' Supp. Br. Ex. A at 17.  In

contrast, Petitioners seek to void a determination by the United States Government, which is well

within the District Court's authority.  *See id.*  The foreign conviction, however, was only one

factor driving the decision in *Idema*.  The dispositive consideration was that the harm was based

on discretionary decisions, as opposed to "legally prescribed consequences."  *Idema*, 478 F. Supp.

2d at 52.  In addition to discussing the Afghanistan conviction, the District Court observed that it

had "no power to . . . in any way affect the discretionary decisions of prospective employers or

family court judges."  Likewise, the District Court is unable to affect the discretionary decisions

of foreign governments or individuals whose actions or beliefs may be harming Petitioners.

Petitioners also ignore the fact that the alleged stigma may derive from the underlying conduct for

which they were previously detained at Guantanamo, as opposed their prior designation as enemy

combatants.  Any disabilities that flow from that conduct will not be removed if the District Court

grants their petitions.  *Cf. Lane*, 455 U.S. at 632-33 ("Any disabilities that flow from whatever

[petitioners] did to evoke revocation of parole are not removed – or even affected – by a District

Court order that simply recites that their parole terms are 'void.'").

Therefore, though the "Court understands [Petitioners'] desire to restore [their] good

name, a habeas petition is not the proper method to do so."  *See Idema*, 478 F. Supp. 2d at 52.

Just as the Supreme Court has declined to regard damage to reputation as sufficient to avoid

mootness, so does this Court.

iii.    *Travel to the United States*

Petitioners cite two ostensible statutory consequences of their prior detention at

Guantanamo that relate to travel to the United States.  As described above, the Supreme Court has

limited post-detention habeas relief to civil disabilities imposed by statute.  *See Idema*, 478 F.

Supp. 2d at 52; *Lane*, 455 U.S. at 631-33.  According to Petitioners, the Department of Homeland

Security Appropriations Act, 2010, which the President signed on October 28, 2009, places them

on the No Fly List.  *See* Pet'rs' Supp. Br. at 3.  That law mandates that

> The Assistant Secretary, in coordination with the Terrorist Screening Center, shall
> *include on the No Fly List any individual who was a detainee held at the Naval
> Station, Guantanamo Bay, Cuba*, unless the President certifies in writing to Congress
> that the detainee poses no threat to the United States, its citizens or its allies.  For the
> purposes of this clause, the term 'detainee' means an individual in the custody or
> under the physical control of the United States as a result of armed conflict.

Pub. L. No. 111-83, § 553, 123 Stat. 2179 (Oct. 28, 2009) (codified at 49 U.S.C. §

44903(j)(2)(C)(v)) (emphasis added).  Petitioners claim that the statute presents a legislated

consequence of their prior detention – they are now on the No Fly List.  They also contend that

under a different statute they are barred from admission into the United States based on their prior

designation as enemy combatants.  *See* 8 U.S.C. § 1182(a)(3)(B) (2009) ("Any alien . . . who has

engaged in a terrorist activity . . . [or] is a member of a terrorist organization . . . is

inadmissible.").

Although the alleged consequences are statutorily prescribed, Petitioners overlook the fact

that statutory-based consequences must still be redressable by a federal court to satisfy the

collateral consequences doctrine.  In the very cases cited by Petitioners, the statutorily-prescribed

disabilities result from a determination or conviction that a federal court can remedy.  *See Carafas

v. LaVallee*, 391 U.S. 234, 237-38 (1968) (finding that habeas petition was not moot after

sentence expired because of statutory consequences from being a convict under New York law);

*Zalawadia*, 371 F.3d at 292 (instructing district court to vacate deportation order for habeas

petitioner whose deportation barred him from seeking reentry into the United States for five

years).  Here, the District Court cannot redress either of the harms.  Perhaps this explains

Petitioners' reticence on the remedies available to the District Court.  While the Court

understands the desire of Petitioners to be removed from the No Fly List, the legality of their detention at Guantanamo is not relevant to the injury.  Regardless of whether their petitions are granted, Petitioners will have been "held at the Naval Station, Guantanamo Bay, Cuba," and thus will be barred from boarding a flight in some capacity.

Granting Petitioners' habeas claims also will not remedy any statutory bar to their admission into the United States.  Under 8 U.S.C. § 1182(a)(3)(B), aliens are barred from entering the United States when they have engaged in "[t]errorist activities," which refers to at least eight categories of conduct, including currently being a member of a terrorist organization.  Absent from these categories is any per se bar against aliens who were previously a member of a terrorist organization.  The District Court, however, is only authorized to determine whether Petitioners "*were* part of, or substantially supported, Taliban or al-Qaida force or associated forces that are engaged in hostilities against the United states or its coalition partners."  Resp'ts' Mem. on Detention Authority at 2 (emphasis added); *Al-Bihani*, 590 F.3d at 871-72 (holding that the Government may lawfully detain Guantanamo detainees under the framework provided to the District Court on March 13, 2009).  Granting Petitioners' habeas petitions thus would not prevent the Government from barring their admission.  For example, even if a Petitioner was not a member of Taliban or al-Qaida, he may currently endorse or espouse terrorist activity (§ 1182(a)(3)(B)(i)(VII)), and thus would be barred.  The converse is also true.  It is conceivable a Petitioner was a member of the Taliban or al-Qaida, but does not endorse or espouse terrorist activity, is not currently "a member of a terrorist organization" (§ 1182(a)(3)(B)(i)(V)), and otherwise does not engage in any "[t]errorist activities."  *See* 8 U.S.C. § 1182(a)(3)(B).  That Petitioner would not be barred from admission under the statute.

Under either statute, Petitioners' prior support for or membership in the Taliban or al-

Qaida does not result in a statutorily-prescribed consequence.  Since the Court cannot redress the alleged consequences, they do not preserve Petitioners' habeas claims.

      *iv.*     *Damages*

      The final consequence raised by Petitioners is that their prior detention at Guantanamo will preclude them from bringing a civil action for damages.  *See* Pet'rs' Br. at 21 n.22.  The habeas corpus statute, as amended by the MCA, states that

> [N]o court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(2) (2008).  Petitioners claim that the Government would "almost certainly" use the fact that a Petitioner was determined to be an enemy combatant to bar any civil damages action.  *See* Pet'rs' Supp. Br. Ex. A at 8.  They posit that if the District Court found that they were not properly detained as enemy combatants, this jurisdictional barrier would be eliminated. Therefore, Petitioners aver, the injury is statutorily-prescribed, concrete, and susceptible to judicial correction, thus preserving their habeas claims.

      The absence of an available damages action, however, is not a sufficient collateral consequence.  In *Spencer*, the Supreme Court concluded that a petitioner's inability to sue for damages does not prevent the dismissal of an otherwise moot habeas claim.  523 U.S. at 17.  The petitioner contended that his habeas petition should survive because, absent a favorable decision on the merits, he would be foreclosed from pursuing a damages action under 42 U.S.C. § 1983. *Id.*  The Supreme Court disagreed, calling the argument "a great non sequitur, unless one believes (as we do not) that a § 1983 action for damages must always and everywhere be available."  *Id.* In any event, it was uncertain, the Supreme Court stated, that a successful habeas claim was a

prerequisite to pursuing a § 1983 claim.  *Id.*

Accordingly, *Spencer* forecloses Petitioners' argument.  Even if Petitioners are prevented under § 2241(e)(2) from seeking civil damages, under *Spencer* a federal court may dismiss their habeas claims as moot.  Indeed, their claim is speculative.  To the extent the District of Columbia Circuit has opined on damages claims of former Guantanamo detainees, it has indicated they lack merit.  *See Rasul v. Myers*, 563 F.3d 527 (D.C. Cir. 2009) (dismissing damages claims brought by former Guantanamo detainees under the Alien Tort Claims Act, the Religious Freedom Restoration Act, the Geneva Convention, and *Bivens*).  Similar to *Spencer*, it is also uncertain the degree to which a successful habeas petition would affect a Petitioner's pursuit of a damages claim.  Under § 2241(e)(2), a federal court does not have jurisdiction over a former Guantanamo detainee's civil action if the "United States" has determined the detainee was "properly detained as an enemy combatant."  In the statute, the term "United States" unmistakably refers to the Executive Branch, not the judiciary.  The sentence at issue distinguishes "court, justice, or judge" from the "United States," as the former has no jurisdiction over non-habeas actions brought against the latter.  Petitioners fail to cite authority indicating that under the statute a "court, justice, or judge" could negate a prior determination by the "United States" that a Petitioner was an enemy combatant.  Since the determination by the "United States" is not subject to court review, it follows that a successful habeas petition would not provide a federal court with jurisdiction to hear a Petitioner's "other action," in this case a damages action.  Therefore, the Court finds that Petitioners' alleged inability to sue for damages is both speculative and not redressable.

The Court is not unsympathetic to potential collateral consequences of Petitioners' prior detention at Guantanamo.  Detention for any length of time can be injurious.  And certainly

associations with Guantanamo tend to be negative.  But the collateral consequences doctrine does not protect a habeas petitioner from any consequence of his prior detention.  Rather, the harm must be concrete and redressable by a court.  On this score, Petitioners fail to carry their burden.  The alleged injuries are either speculative or beyond the Court's authority to redress, and therefore do not save the petitions from being moot.

## CONCLUSION

Today, the Court answers just one of the questions left unresolved by the Supreme Court's decision in *Boumediene* allowing Guantanamo detainees to petition the District Court for habeas relief.  Based on comprehensive briefing regarding the habeas petitions of 105 former detainees, it appears that once a Guantanamo detainee is transferred or released to a foreign country, his petition becomes moot.  The Court finds that Petitioners no longer present a live case or controversy since a federal court cannot remedy the alleged collateral consequences of their prior detention at Guantanamo.  Accordingly, the Court will dismiss as moot the 105 habeas petitions of former detainees in the above-captioned cases.[9]

An order accompanies this memorandum opinion.


April 1, 2010                                        /s/   *Thomas F. Hogan*
                                                     Thomas F. Hogan
                                                     United States District Judge

---

[9] Petitioners make a passing reference to the fact that some of their habeas petitions include non-habeas claims, such as complaints for injunctive and declaratory relief.  *See* Pet'rs' Br. at 24.  In dismissing the petitions as moot, the Court refrains from deciding the merits of any non-habeas claims.  The parties did not brief those claims.  Moreover, *Boumediene* only granted the District Court jurisdiction to adjudicate the habeas claims of Guantanamo detainees.  *See Boumediene*, 128 S. Ct. at 2275 ("Our decision today holds only that the petitioners before us are entitled to seek the writ . . . .").  Therefore, any non-habeas claims included in Petitioners' habeas petitions will be dismissed without prejudice.